You may proceed. Thank you, Your Honor. May it please the Court, my name is Douglas Ohls, appearing for the appellant, the States of Daryl and Cynthia Jones. With the Court's indulgence, I would like to try to reserve five minutes of my time for rebuttal. Okay. Watch the clock. I'll try to help you as well. Thank you very much. Your Honors, I am here on behalf of the heirs of my client, Daryl Jones, who negotiated a contract in 2001. He had spent, prior to that time, as the record will reflect, years in developing the design and the permitting for a power plant at Goldendale, Washington. And after that power plant was well under construction, had a contract in place with a fixed completion date, had liquidated damages, quite substantial. Well, it's a very strange deal, isn't it? I gather Calpine's got to pay for the building of the plant, and then they got to pay Jones on the acquisition of the stocks. Sort of a duplicate payment, isn't it? Well, Your Honor, actually, it's fairly common in the power industry. What happens is that it takes such a long time, so many years, to get through the permitting process and the design process that a great deal of the cost and the risk of doing a power plant are actually incurred before the first shovel of earth is turned. So what was sold here to Calpine, which is a huge billion-dollar multi-state company, was, in fact, something of tremendous value. It was a power plant that was already going and had all the parties tied into it and all the permits that were required. Let me ask you this. If the purchaser had gone bankrupt, so they obviously couldn't ever build the plant, perhaps, would you have a claim for breach of substantial completion? I believe not, Your Honor. I mean, obviously, Mr. Jones was taking some risk in relying on the creditworthiness of the purchaser of the plant. And there may have been some kind of a right he could have asserted as a security interest against the power plant itself, which already had significant value when it was sold. But I don't believe that's the issue. Certainly you're basically saying that, okay, if he didn't go bankrupt and he continued in business, that there's some you have to or at least there's a factual issue as to whether there was a requirement of good faith to attempt substantial completion or to complete substantial completion. Is that right? Yes, Your Honor. I think it may even put a finer point on it to say that the appellants in this case are not arguing that the purchaser of the plant had an inexorable duty to complete the facility. What they're saying is that the purchaser of the plant cannot rely upon the payment reduction clause as a way to get out of paying for it if the reason that the plant is late is the voluntary decision of the purchaser not to build on it. They bought the plant. They agreed to pay the balance when the plant was timely completed. There are at least two express clauses in the agreement which refer to cooperation in getting the job done. There's 6.3, which is a promise on both parties to take whatever steps are necessary to carry out the intent of the agreement. And there's paragraph 6.8, which requires. That's just a boiler plant provision that's in every contract, though, isn't it? Except, Your Honor, I believe that the Court cannot draw an assumption about the intent of the contract without at least considering evidence on it. And, of course, here we are not dealing with the motion for summary judgment, which was the case in most of the case laws cited by the appellee. Here we're dealing with 12b-6, which means that they're saying it doesn't matter what the party's intent was. You have to assume, I believe, Your Honor, for purposes of this appeal, that the intent of the agreement is as it's alleged in our complaint, which was for the parties to work together in finishing this power plant. Let me understand. The first payment under the substantial completion is about $6 million. Is that correct? That's correct. And that payment, and that was, that issue was settled. Well, it wasn't actually settled at the time the matter came before the trial court, but after, since Calpine knew it eventually had to pay that money, when they did eventually get around to finishing the plant, they did pay it off. Okay. So now the issue, the only issue is the $18 million, which was tied to the timely completion. And the question is. And the, at the time that this was in front of the trial court, what was the status of the plant? The status at that time, Your Honor, was that it was simply shut down and that the construction had been essentially halted. I believe there may have been one or two people on site, like caretakers, but. And I'll tell you one thing that bothers me about this. There's a major and obvious disincentive to Calpine to complete the construction here in a reasonable time, the $18 million that they obviously gain if they don't complete the plant, which obviously the parties were aware of when they negotiated this contract, that there's nothing in the contract to deal with that, which suggests to me that they may have been assigning the risk to Jones. Well, Your Honor, that's. You overlook an obvious thing in the contract, that magnitude. If the contract, Your Honor. Can you deduce from that that they were assigning the risk to Jones? That is what the trial court said. The trial judge ruled that this must have been an assumption of risk by Jones. But our point is, Your Honor, that that requires a factual inference from the document. It is equally possible that the language that was in there, as we argue, was an incentive to protect Calpine against delays that aren't worth its own causing. In other words, at that time, as the Court may recall, there were spikes in the energy prices, not as high as we have now, but there were ones which, by comparison with earlier years, were substantial. And so Calpine wanted to get the plant done quickly, too. That's why they wrote into this contract these clauses that require Jones to be cooperating actively, paragraph 6.8 in the contract, for example, that require Jones to cooperate in getting the plant done, because Jones had knowledge of the permits and things like that. So what we allege is both parties were completely on track with the idea of trying to expedite getting this power plant done. And if we were allowed to conduct discovery, if we were allowed to even get into the facts, we believe we would show that that was the intent and that was the context. So when we have this clause that Your Honor refers to as boilerplate, that says that the parties are supposed to cooperate in reaching the intent of the contract, since the intent is not stated in the contract, how can the court on 12b-6 motion make a conclusion as to what the intent was without even allowing any evidence on that subject? That point, I think, goes to your proposed amended complaint. Can you tell me how you think that would have changed the calculus at the 12b-6 stage if the court had permitted you to file that complaint? Yes, Your Honor. The paragraph 3.6 of the complaint alleged that Jones and Calpine had mutually contemplated that they would be cooperating together in enforcing a timely completion of the plant. And for the first time in the ‑‑ it was never ‑‑ the word contemplated was never brought up by Calpine as being a reason to dismiss our complaint. But the trial judge, during the reply portion of the oral argument, in other words, after we had spoken and we were allowed to speak again, the judge asked counsel, distinguished counsel for Calpine. He says, well, look, if the plaintiff had said the parties agreed that they would be cooperating to expedite completion of the plant, then wouldn't I have to deny the motion? You'll find this in dialogue in footnote 46 of our appellate brief, the first one. And counsel agreed and says, yes, Your Honor, in that case, you'd have to deny my motion to dismiss, because then it would be clear that you're alleging an agreement. Well, Your Honor, we use the word contemplate in what we regard as the old English meaning that includes intent. So the court went ‑‑ had cited a particular version of dictionary, and we went into the public library and actually managed to find the same version that the trial court had on his shelf in Chambers. And we noticed that another definition of the same word was intent. So since mutual intent, everyone agrees, is the cornerstone of contract interpretation, it doesn't seem appropriate to throw out our complaint simply because we use the word contemplate instead of intent. But what we did to the trial court, we said, look, Your Honor, if you are troubled by the word contemplate, which we weren't really prepared to address when we went into the hearing because it had never been raised by Calpine, but since the court raised it, we were ‑‑ we asked to amend our complaint to clarify that what we meant was contemplate, intend, and agree. And it's interesting, Your Honor, that in Calpine's own appellate brief at page 7, they say, quote, the issue is therefore whether the complaint alleges the existence of any express or implied agreement that Calpine was obligated to make efforts to achieve substantial completion before the expiration of the contractual window. Well, may it please the panel, we could hardly be more clear than we were. We used the word contemplate. When the judge had trouble with that, we timely moved to amend. And then the judge said, well, you know, actually, now come to think of it, it wouldn't have made any difference even if you had said mutually agreed. Well, even opposing counsel agreed with the trial court that it should make a difference in that situation. And we don't think that an $18 million lawsuit should be thrown out because of the selection of the word contemplate rather than the word intend or the word agreed. What about your argument of the implied duty of good faith that applies to every contract in Washington and other states? Is that something that the Court could decide on summary judgment? I mean, not on summary judgment, but on a 12b-6? Your Honor, I think not in this situation. And the reason why was actually highlighted by the trial court itself in its own opinion. And that is that – and maybe we're talking here too broadly about the implied duty of good faith. Implied duty of good faith is one phrase that courts have used to describe a part of what is elsewhere known as implied-in-law duties. But actually, there's implied-in-fact and there are implied-in-law duties. Implied-in-fact duties are ones where, when the court considers the facts and the circumstances of a transaction, it determines that the parties actually must have intended to agree on certain either additional terms or certain interpretations of terms that are in the agreement. That's what you're alleging in your second complaint that you thought you alleged in the first complaint? The implied-in-fact? Yes. But also implied-in-law, Your Honor, a point which I think we developed even more in our second brief than in our first brief. Implied-in-law duties are that even if the parties never sat down and talked about this issue about whether Calpine has some discretionary right to avoid making the payment simply by stopping construction for some months and then starting it up again, even if that had never been discussed or considered, there is a basis in law to imply a term that a party cannot enter into a contract based on conditions and then work intentionally against those conditions. And there is elaborate and extensive authority, which we have cited both in Washington and even in the Ninth Circuit. Doesn't that have to attach to some sort of express promise? No, Your Honor. There are not. You're saying it attaches to an implied promise. That's right. There are two levels here. That's correct. And there is a case in the landlord-tenant context which talks about the duty of good faith attaching to a term that's written in a contract. But we would argue, Your Honor, that the term is in the contract to begin with. There is a term of cooperation. The question, what is cooperating in the intent of the agreement, means. That's a term that's in the contract. Moreover, the payment reduction clause itself, paragraph 2.2, is in the contract, obviously. And in order to – since the clause doesn't say what its purpose is, one has to look outside the agreement to find out what the purpose was. If the contract had said payment is reduced by 18 million if the power plant is late and Jones assumes the risk that Calpine might not continue with construction, if it had said that, we would have no case. We would have no appeal, because then any attempt to try to offer extrinsic evidence to show what the purpose of that clause would be an obvious attempt to vary the wording that was in the agreement. But the contract doesn't say anything about why that language is in there. And what we argue we submit is an equally or at least a reasonable or possible interpretation of the contract, which is that that clause was intended to protect Calpine so that if Jones, for example, failed to cooperate, or maybe if some facts totally outside the control of the parties had come along and caused a delay in the completion, that then that reduction in payment clause could still be enforced. But the – The guess was that the use of the word contemplate here was probably a weasel word in the negotiation that neither side wanted to make this entirely clear, so they used the word contemplate, which has got several dictionaries. Yes, Your Honor. Actually, the word doesn't appear in the contract. It may be breeding. It unfortunately originates with me. But it originates with me, Your Honor, because my – I have read many cases and many horn books that talk about the contemplation of the parties as being another way of expressing the intent of the parties. Unfortunately – Did you make any proffer, even though it was a 12b-6 motion, as to the kind of evidence that would be extrinsic in showing the intent? No, Your Honor, because we were not permitted to speak after the Court raised the issue for the first time during the reply period, the oral argument of the hearing. The Court should bear in mind that this issue was not raised in the – in the pleading. But when you moved to amend your complaint, remind me, did – We did not in that motion, Your Honor. All right. But I think we've cited authority in our reply brief pointing out that parties are not required to offer a showing of the extrinsic evidence in a 12b-6 motion because the Court on 12b-6 is supposed to assume all the facts to be as we have alleged  Unfortunately, in this case, it's clear that the trial court was drawing inferences based on his interpretation of the facts, even when there's nothing in the contract that refers to them. In this case, we certified the Supreme Court of Washington, assuming that that procedure is possible here. I don't know if it is or not. There is a procedure, Your Honor. I know only from having worked for the court system myself, the district court, in my first job. I don't know how grateful they are, but there is such a procedure. Basically, just to make sure it's clear, Your Honor, what the trial court has done here is make assumptions in at least four areas. First, the trial court has made assumptions as to what the purpose of the payment reduction clause is. Calpine says it was intended to give Calpine unfettered discretion to stop construction and then avoid paying for the power plant. We don't think that that's an inherently reasonable interpretation because no sophisticated person would sign a contract leaving his compensation completely up to the whim of the other party. It's therefore our interpretation, which we haven't offered evidence on, but in fairness, we don't believe we're required to offer evidence until we're actually in a summary judgment hearing. Secondly, the court made assumptions that Jones had assumed the risk of Calpine unilaterally stopping construction. And where does it say that? There is absolutely nothing in the record which suggests that Jones ever assumed such a risk. That risk is not mentioned anywhere in the contract agreement. And then the court says, well, that's because there was this the construction agreement that Jones had negotiated with another company called NEPCO had a convenience termination clause in it. And the court bought into that. The trial court says, well, okay, that must be the evidence that Jones assumed the risk that the work was ceased. But the inclusion of a termination convenience clause is just as much a tool of achieving timely completion as it is a method of stopping construction. And what happened in this case, the contractor who was hired first. I just want to point out, you might want to wrap up if you want to save some time. Thank you, Your Honor. I will come very quickly to the point. But the areas of assumption, assumption of risk, trying to interpret this convenience termination clause in an agreement between Jones and NEPCO without considering any evidence from either of the parties to that agreement. Nonetheless, the trial court felt apparently confident in interpreting that agreement. And finally, the court's conclusion that merely because there was an integration clause of a boilerplate type, Your Honor, saying that this is the complete agreement, that the inclusion of such a clause somehow therefore wipes out the entire law of implied in fact and implied in law agreements for which we have cited, I think, at least eight to ten cases. Thank you. We'll reserve the balance of our time. Good morning, Your Honors. My name is Lad Levins from Davis Wright Tremaine. And seated at council table with me is Fred Burnside, who was on the brief. May it please the Court, we represent Calpine Corporation, who is the defendant below and the appellee in this proceeding. The case comes before the Court on an appeal from an order dismissing on a 12b-6 motion the plaintiff's complaint for faking a stated claim. And the standard, which is a relatively low standard that the plaintiff was required to meet below, was it had to prove or we had to demonstrate that the complaint did not allege facts that, if true, would have entitled the plaintiff to relief. I can see it's not a high standard that the plaintiff has to meet. What were the averments in the complaint that are at issue here? There really were two substantive averments. One was that in April of 2001, Calpine and Mr. Jones entered into this purchase agreement. And the purchase agreement is in the record because it would refer to in the complaint. That's averment number one. And the second averment of substance is that in late 2001 and in early 2002, Calpine slowed and then ceased efforts to reach substantial completion by July 1, 2002, which is the date on which the $18 million begins to tick down to zero. Are these facts sufficient, if true, to prove that Calpine owes Jones money? That's, I think, the main thrust of the claim is, are these facts sufficient to prove that Calpine breached its contract? And that really raises, I think, there are kind of two general questions that have been argued in the cases in the reading below and here in the Ninth Circuit. One is, what does the contract mean? And the second is, I would phrase generally, kind of what about extrinsic evidence? On the question of what the contract means, the trial court, I think, in its lengthy opinion, went through in some detail an analysis of the contract, which, unsurprisingly, we're wholly in accord with, with respect to the ---- Well, how about this contemplate clause? I thought the judge kind of brushed that off with a ---- One dictionary meaning, and the other side gives it a different one. Why is it in there? What's the purpose of putting in this clause? It doesn't mean something. Well, as Mr. Olds pointed out, the ---- this clause about what the parties contemplated isn't actually in the purchase agreement. It's in the complaint. And what the complaint said originally in paragraph 3.6 is, at the time the contract was executed, and I'm going to paraphrase now. I can't go to it. It doesn't say, as Mr. Olds, I think, misspoke. It doesn't say the parties mutually contemplated. It just says both parties contemplated. And an unexpressed and co-aid intent ---- We're talking about a dismissal of a complaint, though. I mean, can't you construe this as being an adequate allegation? I'm not sure why you can't. Let me read you the allegation that has contemplated in it, which I don't think you mentioned. It basically says, Calpine owed a duty of good faith and fair dealing by which Calpine was obligated to perform its contract duties so that Jones and his successors would reasonably obtain their contemplated benefits under the agreement. So just piggybacking on Judge Cuddy, why isn't that enough of an allegation of a breach of implied contract to go to get you past the 12b-6? I can say a couple of things about that. One is I think that contemplating something is different than agreeing to it is kind of the base level response, which is what the trial court also believed. And I think the second thing is that ultimately I think ---- I guess when I was responding to those questions from the trial court below, I had in mind that maybe what the plaintiff had in mind was some oral agreement outside the contract that as Mr. Jones and Calpine's representative were walking out of the lofts is where this contract might have been drafted. Jones said, now, Calpine is going to go ahead and try to finish by July 1, aren't you? And Calpine said, yes, we agree to do that. And they were going to offer evidence of that. That isn't the case. And that was true. And let me ---- And what the ---- and I frankly hadn't noticed this, and forgive me for not being here, but what Jones said in the briefing on the motion to amend and what they reiterate in their ---- in their brief of appellate here is that they really don't seek to offer any evidence of any other agreement. What they're relying on is the purchase agreement itself. And they say, and I'm quoting from 8 and 9 of their brief, plaintiffs do not seek to add a new term. They do, however, offer, and I think they don't want to offer, extrinsic evidence as to why and when Section 2.2c2 was intended to reduce the contract price. They just want to talk about the meaning of 2.2c2, which is the $18 million provision. So they're really not alleging anything except what's in the purchase agreement itself. So I think, you know, the answer is this contemplation, allegation of the complaint is really just a reiteration of here is the contract, here is the purchase agreement, the written purchase agreement. And this gives us the cause of action. So I think that brings us back then to the trial courts. Excuse me. Well, wait a minute. I guess you could contemplate your navel, but I don't think that's a ---- Well, let me use this analogy, Your Honor. If I'm in a car dealership and I'm contemplating that I will buy a car and the salesman who's there with me is contemplating that I will buy a car, we haven't agreed that I'm going to buy a car. Until I actually say orally I agree to buy a car or I sign a contract to buy a car, we haven't agreed. And the way that they ---- that the counsel for Jones attempted to amend the complaint I think is significant. They didn't say we're going to amend to say they agreed that CalPlan would go forward. They amended to say, proposed to amend to say that the parties contemplated, intended and slash or agreed to go forward. Well, that's ---- they did say they agreed. That's the allegation. Well, that's a little bit like saying ---- Well, they can say whatever they want, you see. That's not neither your position or the district court to restrict what they say. They said what they said. That's certainly true, but then you have to look and see whether what they said states a cause of action. But, you know, what doesn't make sense here is it doesn't make sense in some ways that you have this purchase price set up and then you have this section on amounts that you have to pay and you have to pay a substantial completion if there's not some obligation in good faith to move forward with that. Well, two things. And so what is your response to that? Two things on that. One is if you read the contract as the trial court did, I think the trial court said if I read the contract and if you're not looking at extrinsic evidence, the interpretation of the contract is an issue of law, not of fact. If I read the contract, there isn't. The contract does not impose any obligation on Calpine to go forward. So what you have is a situation where Calpine absolutely controls whether there's any of that $18 million due in owing at any time in the future. That's correct, Your Honor. All it has to do is shut down, do nothing, never at the conclusive $200,000, $200,000 per day. That's correct, Your Honor. Once you've had enough days, Calpine walks out the door with zero obligation. Calpine, bear in mind, has paid $20 million for the privilege of walking out the door, as you put it. And so one might ask why Calpine would do that. And, you know, the Court might say, you know, why would anybody – my learned friend, Mr. Olds, has said, why would anybody logically enter into a contract that said that? But he hasn't offered any extrinsic evidence as to why they might have. Let me hypothesize how that might have occurred. The Court will recall that in April of 2001, there were brownouts in California. The governor of California was paying huge amounts of money to buy future energy because prices were skyrocketing. And the Court can imagine that an energy company like Calpine might see this as an opportunity to build new energy plants and to sell that power in the future. But Calpine also says to itself, you know, prices may drop. And this energy plant I'm buying now for $20 million plus the money in the in 2002 if the prices drop. And if Jones keeps the plant himself, he's going to be in the same situation. That plant may not make money in 2002. And so they say, look, I'll pay you $20 million now for the right to build this factory. I've got to spend $140 million to do it. And if energy prices stay high, and if we can meet the summer market, and, you know, let's hypothesize – these facts aren't correct. Let's hypothesize that energy companies make most of their money in July, August, and September when energy demand is high. They say if prices stay high and if we can make the summer market, then we're going to make a lot more than $200,000 a day during that summer. So if we can do that, then I'll share some of that with you, Mr. Jones. But if we can't, if energy prices go down or if we can't make that summer market, the plant isn't worth that additional $18 million to me, and it wouldn't be worth it to you if you had it.  Okay. That's one hypothetical which you could infer. That's the question they're saying is the judge is inferring who bears the risk. If your client was within a hair's breadth of substantial completion on June 15, 2002, and then it stopped and it waited 100 days and got itself through the 90 days, you know, past July 1, would it be a position that they wouldn't owe? And they just said, look, we're right up here. If we wait 90 days, all we have to do is kind of put a hold on our project, then we don't have to pay the 18 million. Would that be their position? It would be their position, I believe. And the reason is that, you know, the energy prices are going to be hypothetical. The energy prices are going to be hypothetical. No, no, that's your hypothetical. My hypothetical says I don't want to pay $18 million, so why not just stop construction, wait 90 plus a few days, and start back up? And sorry, guys, it wasn't done on July 1. I guess the response to your question, Your Honor, is that Mr. Jones, the way the contract was structured, was willing to rely on Calpine's self-interest in finishing that plant by July 1, 2002. If it was economically beneficial for Calpine to finish that plant by July 1, even with this $18 million obligation, it would do it. Jones must have realized that if it wasn't economically beneficial, whether it's the day before or six months before, whenever, Calpine might not do it. But the risk that it wouldn't be economically beneficial. Well, that kind of comes back to the intent. He said, you know, you have to play out the intent of the parties in the contract according to the terms of the contract. That's a possibility, but why shouldn't there be evidence as to what was the intent of the parties vis-à-vis the $18 million clause? The question, I think, in my mind would be, does the complaint allege facts that would cause someone to say, yes, the burden, the risk is on Calpine, Calpine had an obligation to move forward. And the Court asked Mr. Old when he was standing up here a few minutes ago, have you ever made a proffer regarding what you would prove? And Mr. Old said no, not below and not in the Ninth Circuit. And, you know. Well, I might have made it or someone else, but is there any legal obligation to make that at a 12b6 stage? I think, yes. I mean, imagine, for example, somebody comes in and said, and files a complaint that says, I have an implied, in fact, contract with Calpine under which they owe me $18 million, period. At that point, it seems to me that the, if a 12b6 motion is filed, and if I were the defendant, one would be, the plaintiff has an obligation to say, here are the facts I would prove in a brief and a proffer of some kind. Here are the facts I would prove, that I could prove, to show that there is, in fact, an implied contract, implied, in fact, contract for $18 million. That hasn't been done here. And I really, that, you know, that paragraph 3.6, that contemplation clause, is really that kind of a general, unspecific allegation. And the plaintiff has been unable, even hypothetically, to give it any substance which, by way of proffering facts that are true, would entitle them to release. All they have, all they have proffered is the purchase agreement itself. And I think the trial court's analysis of that contract is dead on. I think so. In the Highlands Plaza case, the Washington Supreme Court quoted Williston, the principle of fundamental justice that a promissor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends. He cannot take advantage of the failure. How do you get around the court's adoption of Williston? You know, I'm not going to pretend that, and there are probably, as Mr. Olds said, eight or ten, probably more than that, cases that are cited on this issue of a waiver of condition precedence by the one party's either hindering another from causing them to occur or themselves failing to make them occur. And I think this area of the law is not a seamless web. It's not possible to make all these cases consistent. In the specific case the Court is talking about, in Highlands, Highlands something versus the Viking investment. Highlands Plaza. Thank you, Your Honor. Highlands Plaza. That is a case in which Highlands Plaza volunteered or agreed, excuse me, to convey clear title to real property. And then it failed to clear, I think it failed to get a man named Olson's release in that case, so it couldn't convey clear title. And what the Court there said, what the facts of the case, I think, reveal, and what the Court really said was, look, this contract obligated you to convey clear title, and you didn't do it, so you breached the contract. And there's language in there about the condition precedent, but I don't think that's the basis on which the case was really decided. And there are – there are – Well, certainly on its face, given what Calpine could do under this contract, Williston would seem to say that Calpine cannot rely on the failure of performance. Your Honor, what we're talking about here is implied in fact contracts, not implied in law contracts. An implied in fact contract necessarily depends on the facts of the case. The facts of Highlands Plaza are different because in Highlands Plaza the defendant was agreed to convey clear title and couldn't do it. The facts here are different. What we have is a contract that the trial court has found does not obligate Calpine to go forward and use best efforts. The trial court relied on, and some of these other cases rely on, restatement of contract section 245, which says that if a condition precedent doesn't occur, then the party whose obligation is triggered has waived the condition precedent unless the contract imposes the risk that the condition precedent won't occur on the other party. And that's exactly what the trial court said with the case here based on the only allegation of substance really in the complaint, and that is here is this purchase agreement. The trial court looked at that purchase agreement. Now, these cases that are referred to in the various briefs fall into a number of categories. There are cases where the occurrence of a condition precedent is not within the control of the party whose obligation is triggered by it. Cavill v. Hughes is such a case. And in Cavill v. Hughes, the seller of property got basically decided and got cold feet with respect to conveying his house. And so he interfered with the approval of the buyer's application to be a member in the country club, which was a condition precedent of the purchase. He went out and interfered with it. He voted against it on the board. He, I don't remember the facts, persuaded others on the board to vote against it. The court said, look, if you go out and interfere with the other party's attempt to fulfill a condition precedent, then the way I would analyze that is that's a breach of the duty of good faith and fair dealing. And then there are cases like this one where the condition precedent's occurrence is within the control of the party whose obligation is triggered by it. Here, Calpine admittedly, at least to some degree, had the power to try at least to reach substantial completion by July 1 and it didn't do it. Now, is that wrongful? Is that wrongful such as a breach of contract? Well, it's not wrongful if the contract does not impose on Calpine the obligation to go forward and try to satisfy the condition precedent. Section 245, consistent with that statement? Yes, absolutely. Absolutely. Section 245. The only outdate that's given in 245 is the assumption of risk by the other party, isn't it? The contract imposes the risk on the other party. And Judge Zilley said. Well, that's not present here, of course. But why doesn't 245 cover this, these facts? I think it does. And the trial court below said that it did and said I've analyzed the contract as to which no extrinsic evidence has been offered. I mean, there was a lot of discussion in the briefs about the right to offer extrinsic evidence, but it was almost treated as though it were an evidentiary question. But the whole question of extrinsic evidence is entirely hypothetical in this case because none was ever identified. No extrinsic evidence has been identified. Let me take you back. I mean, one of the difficulties, to be sure, is that it's a fairly thin complaint in terms of allegations beyond restating parts of the contract. But there is an allegation in here that I'm interested in your comments on. It says, When the agreement was executed, both parties contemplated Calpine would enforce the EPC contract and would continue in good faith with construction of the facility to be completed by July 2002 or soon thereafter as reasonably possible. Is that sufficient in terms of an additional alleged agreement? Whether or not it can be supported, we don't know. But why wouldn't that be enough to put you into a factual question? That's paragraph 3.6 of the complaint. Yes. Which is the – There's kind of two of them that talk about contemplation, but that's one. And that's the paragraph of the complaint that I was questioned about by the trial court, and my response, which the trial court agreed with, was that an allegation that two parties contemplated something is not an agreement that it will occur, in the same sense that if I contemplate I'm going to buy a car and the salesman contemplates he's going to buy it. We haven't agreed to buy it. But then that got the district judge into the dictionary, which got your opposing counsel into – back into the same dictionary in an amended complaint. Which was pled in the alternative. It said, you know, maybe they agreed or maybe they didn't agree is essentially what that allegation said by the use of and or in the proposed amended 3.6. What they proposed to do is amend it to say you have any – I mean, I think that lawyers do that to preserve all options, presumably, or to make sure they don't miss something. If one of those said that they agreed, is that enough to at least allege an agreement to go forward? Their papers make clear at 8 and 9 of their brief of appellant, it makes clear that the only agreement they're talking about is the purchase agreement. They're not talking about anything else. And so it was at the bottom of page 8 and the top of page 9, they quote from their pleadings in the motion to amend. And, Your Honor, I reiterate again, I think that and or is a killer for them. To say that they contemplated and or agreed is different from saying they agreed. It's saying we don't really know what they did. We can't, in good faith, allege what they did. But maybe they agreed. And we'd sure like to conduct discovery to find out. At root, what the plaintiffs want to do is conduct discovery to see if they have a cause of action. But their complaint doesn't state a claim. Thank you. My time is up.  Would you answer the specific question that was just Mr. Levin's just addressed, and that is that this paragraph 3.6 suggests there may be something outside the contract, but that all of your briefing and your position has been no, there's no additional agreement. So would you clarify for us whether you offer an additional agreement or are we, are you just saying it's all within the four corners of the agreement offered? We're not saying, Your Honor, that it's all within the four corners. But on the other hand, we are also not arguing that there is some side discussion out in the hall that we're trying to exalt into an agreement between the parties. What we are arguing is, first of all, we're saying that you should look, that we are entitled to offer extrinsic evidence about the express terms of the agreement, which include the mutual commitment to take whatever steps are necessary to carry out its intent. And we say the intent of the agreement. You haven't suggested any specific fact that might be shown, hypothetically, or otherwise. Actually, I thought, Your Honor, earlier today that we believe, and we would offer evidence if we were called upon to do so or given a chance to do so. We believe that the intent was that this payment reduction clause was the protection to Calpine against delays caused by Jones or by events outside the party's control. That it wasn't to protect Calpine against its own unilateral decision to suspend the construction. That's an alternative explanation of the clause that's in the contract. However, in further response to your question. Kennedy. It's very hard to make that distinction. So first, we're looking at the express language of the agreement. Secondly, we are arguing that there are terms which should be implied into the contract, either implied in fact or implied in law. But in doing that, you're not suggesting that there was an agreement between the two parties that said you have to go ahead with this, and if you don't, you know, you're still on the hook for the $18 million. You're not saying that there's anything like that, that there's actually an agreement that gets imported into there for purposes of intent. Well, Your Honor, under the Washington context rule of contract interpretation, you look at the circumstances to determine the meaning of words. We believe that the circumstances of the negotiation of this contract were that both parties were had in mind when they wrote the language that they did write, that this clause to reducing the price did not have related to something other than Calpine's own unilateral stoppage of work. Because that would render the whole contract illusory. Why didn't you put that in your complaint? Well, we thought we did, Your Honor. I mean, when we're talking about implied mutual contemplation of the parties, which by our request to amend included mutual agreement of the parties, that's what we mean. And, Your Honor, I think what counsel has pointed out in some of his argument today is precisely the problem at the trial court level. It's this confusion between summary judgment motions and dismissal motions. Today, counsel says, well, we should have been proffering evidence. You don't have to proffer evidence, Your Honor, in support of the complaint under the rules unless there's a summary judgment motion that challenges you to bring your evidence forward. In fact, a proffer of evidence on a 12b-6 motion is usually ruled irrelevant. That's exactly right, Your Honor. And so I don't think we should be beaten up over the fact that we didn't proffer evidence. I would also point out that the argument that counsel made today was that you're saying in your brief that if you were allowed to show extrinsic evidence, you could make a showing that would support your position here. But she's saying you didn't have to make a proffer of that. Well, Your Honor, technically under the law, on an appeal from a 12b-6 motion, it should be sufficient for us to point out that our allegation in our complaint was sufficient. And if we allege that the parties mutually agreed, which is what we were trying to say under our amendment, then it shouldn't be necessary to then offer evidence as to why we think the parties mutually agreed. One last point. On your amendment, the argument Mr. Levins makes is it's really not an allegation of an agreement because it's got the oral language that it might not have been an agreement, it might only have been a contemplation. Your Honor, I would first note that it's not an argument he wrote, he raised in his brief. So it's a new argument he's raising today, which is, I guess, sort of our history in this case of having new arguments come up in the last segment of the oral presentation. So it's kind of a variation on the motion to amend arguments. But as Your Honor said, we believe that when a party alleges that you either contemplated, intended, or agreed, that's alleging all three of those things. We're not watering down the allegation of an agreement. We firmly allege, and we have asked, we asked the trial court for permission to amend our complaint so that we would be alleging an agreement between the parties and also alleging mutual intent, which is relevant, Your Honor, even if the parties had never actually gotten together and talked about this. If a reasonable interpretation of the contract is to imply terms either in fact or in law that the parties would or should have agreed to under these cases that we've cited, it's still appropriate to import those terms into the contract as long as they don't contradict anything that's written. Thank you. Thank you. I think we have arguments of both parties in mind. The case of Jones v. Calpine is submitted. Thank you for your arguments.
judges: Cudahy , T.G. Nelson, McKeown